329 F.3d 1135
 John DOE and Jane Doe, Plaintiffs-Appellees,
v.
George J. TENET, Individually and as Director of Central Intelligence and Director of the Central Intelligence Agency; United States of America, Defendants-Appellants.
 No. 01-35419.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted February 7, 2002.
 Filed May 29, 2003.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Daniel L. Pines, Central Intelligence Agency, Mclean, VA; Stuart Schiffer, Francis J. Diskin, Barbara L. Herwig, and Freddi Lipstein, Department of Justice, Washington, DC, for the defendants-appellants.
 Steven W. Hale and Elizabeth A. Alaniz, Perkins Coie LLP, Seattle, WA, for the plaintiffs-appellees.
 Appeal from the United States District Court for the Western District of Washington; Robert S. Lasnik, District Judge, Presiding. D.C. No. CV-99-01597-RSL.
 Before: CANBY, JR., BERZON,* and TALLMAN, Circuit Judges.
 Opinion by Judge BERZON. Dissent by Judge TALLMAN.
 OPINION
 BERZON, Circuit Judge:**
 
 
 1
 Jane and John Doe — fictitious names, adopted for this litigation for reasons that will appear — assert that they performed espionage activities on behalf of the United States against a former Eastern bloc country. The Central Intelligence Agency (the "CIA"), they say, assured them that it would provide assistance in resettling in the United States as well as lifetime financial and other support. According to the Does, the CIA has now reneged on its obligation of support. The United States will neither confirm nor deny the Does' allegations, for reasons of national security.
 
 
 2
 We must decide whether the Does can sue the CIA for the alleged wrongs committed by the Agency, or whether, instead, their action is either appropriate only in the Court of Federal Claims or precluded by the venerable doctrine enunciated in Totten v. United States, 92 U.S. 105, 23 L.Ed. 605 (1875).
 
 
 3
 * We assume, without deciding, that the facts as alleged by the Does are true and construe the complaint in the light most favorable to their case. See Burgert v. Lokelani Bernice Pauahi Bishop Trust, 200 F.3d 661, 663 (9th Cir.2000). The facts that appear in this opinion, with the exception of procedural history in federal court, are all, therefore, simply allegations, even when not stated as such.
 
 
 4
 The Does allege that they were citizens of an Eastern bloc country formerly considered an adversary of the United States. During his tenure as a high ranking diplomat for that country during the Cold War, Mr. Doe approached a person associated with the United States embassy and requested assistance in defecting to the United States.
 
 
 5
 The Does recount that after this request was made, CIA agents took them to a "safe house" for approximately twelve hours. The CIA officers employed intimidation and coercion to convince the Does to remain instead at their diplomatic post and to engage in espionage for the United States. The agents told the Does that if they agreed to conduct espionage on behalf of the United States, the CIA would arrange for their resettlement in the United States and ensure their financial and personal security "for life." The Does further allege that the agents assured them that this assistance was approved at the highest level of authority at the CIA and was mandated by U.S. law.
 
 
 6
 The Does state that although they were initially reluctant to conduct espionage activities, they eventually agreed to do what was asked of them. They allege that they carried out their end of the bargain but that the Agency has now reneged and abandoned them to fend for themselves.
 
 
 7
 The Does represent that they entered the United States under the special provisions of the "PL-110 Program."[1] Pursuant to that program, the CIA provided them with false identities and backgrounds and offered to "retire" them with financial and health benefits. The Does allege that the Agency provided them with various benefits, including health care and education. Because the Does desired to "become integrated into American society," they requested that the CIA assist them in obtaining employment. They claim that the CIA continued to assure them that, to the extent that their earned income was insufficient to meet their needs, they would be supported by the Agency for the remainder of their lives with a "safety net," which was "required by law." The Does allege that they were told that such support was required on the basis of their classification as "PL-110s."
 
 
 8
 The Does eventually settled in the Seattle area, and were initially provided with a stipend of $20,000 per year, as well as housing and other benefits. Over time, their stipend was increased to $27,000. They say that with the CIA's assistance in providing false identities, resumes, and references, Mr. Doe obtained professional employment in 1987. As Mr. Doe's salary increased, the amount of the stipend provided by the CIA commensurately decreased.
 
 
 9
 In 1989, Mr. Doe and the CIA allegedly agreed that once Mr. Doe's salary hit the $27,000 mark, his stipend would be suspended. However, Mr. Doe received the CIA's assurance that if his employment were terminated, his stipend would be resumed. The CIA assertedly assured Mr. Doe that the Agency would "always be there" for the Does.
 
 
 10
 As a result of a corporate merger in 1997, Mr. Doe lost his job. Although Mr. Doe made efforts to find new employment, he says that his advanced age and his security arrangement with the CIA, which required him to use the false identity and background that he had been provided, limited his options. The Does assert that they contacted the CIA to request assistance. The CIA refused to assist Mr. Doe in finding a new job as it had done in the past. Mr. Doe has remained unemployed. After several failed attempts to obtain CIA assistance, the Does sought legal representation.
 
 
 11
 In 1997, the Does were allegedly informed by a CIA representative that the Agency had determined that the benefits they had previously been provided had been adequate compensation for the services rendered and that further support would not be provided. The Does were then told that they could appeal this decision to the Director. The Does' counsel therefore prepared an appeal to the Director. While so doing, the Does' counsel repeatedly requested from the Agency internal regulations governing the appeals process as well as regulations regarding resettled aliens. The CIA never responded to these requests. Other requests for access to records or individuals within the CIA were also either denied or ignored by the CIA.
 
 
 12
 Nevertheless, the Does claim, they filed their administrative appeal with the Director in late 1997. It was subsequently denied. The Does assert that they then appealed to the Helms Panel, a panel consisting of former Agency officials. The Does allege that the Helms Panel recommended that the Agency provide the plaintiffs "certain benefits ... for a period not to exceed one year, and nothing thereafter." The payment was conditioned on the Does' signing waivers and release documents. Apparently, the Does declined to execute such documents and therefore did not receive the payments recommended by the Helms Panel.
 
 
 13
 The Does then filed suit in the United States District Court for the Western District of Washington. They asserted claims under the Equal Protection and Due Process Clauses of the United States Constitution, seeking declaratory, injunctive, and mandamus relief. Their complaint further requested that the district court require the CIA to resume payment of the benefits allegedly promised and provide constitutionally adequate internal review procedures.
 
 
 14
 The United States moved to dismiss the case for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The district court denied the CIA's jurisdictional motion under Rule 12(b)(1), finding that the rule announced by the Supreme Court in Totten did not prohibit the court from entertaining this suit. The district court determined that the trial could proceed despite the alleged existence of a secret agreement, and any materials involving national security interests could be adequately protected by submission under seal or by in camera review.
 
 
 15
 The district court also rejected the CIA's contention that the Tucker Act, 28 U.S.C. § 1346, requires that this case be heard in the United States Court of Federal Claims, because, according to the Agency, this was essentially a contract suit seeking money damages from the United States. The district court reasoned that although the Does' request for injunctive relief may have included a directive that the CIA resume payments, the Does were not seeking solely a money damages judgment.
 
 
 16
 The district court went on to determine that the Does had properly stated both substantive and procedural due process claims, even apart from the existence of an alleged secret contract with the Agency. First, the district court found that "[the Does] may be able to base their entitlement to receipt of the CIA's monetary stipend on theories other than contract. For example, if plaintiffs are able to prove an entitlement to benefits based on a promissory or equitable estoppel theory, or if there is a regulatory or statutory basis for their entitlement, then they may be able to show a constitutionally protected property interest, regardless of Totten." Further, the court found that the Does had sufficiently stated due process claims on two separate theories — that the CIA had placed the Does in danger and that the CIA had created a special relationship with the Does.[2]
 
 
 17
 The United States later renewed its motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) and moved for summary judgment under Rule 56(c). The district court denied these motions and we granted an interlocutory appeal. See 28 U.S.C. § 1292(b). On appeal, the United States maintains that there is no jurisdiction over the case because any suit must be in the Court of Federal Claims, and because the rule in Totten, 92 U.S. at 107, requires dismissal of the Does' case. We disagree.
 
 II
 
 18
 At the outset, we must address whether the Tucker Act, 28 U.S.C. § 1491(a)(1), precludes the district court from exercising jurisdiction in this case. That Act, in relevant part, grants the Court of Federal Claims exclusive jurisdiction over any claim against the United States in excess of $10,000 that is "founded ... upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).[3]
 
 
 19
 The Does do not frame their complaint expressly to assert a contract claim. Indeed, they reserve the right to bring a contract action in the Court of Federal Claims at a later date. The label that is attached to a claim is not conclusive, however. Whether an action is founded upon a contract for purposes of the Tucker Act "depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." Megapulse v. Lewis, 672 F.2d 959, 968 (D.C.Cir.1982); see also North Star Alaska v. United States, 14 F.3d 36, 37 (9th Cir.1994) (adopting the Megapulse test).
 
 
 20
 The Does' complaint may be read as seeking an injunction directing payment of $27,000 per year because that figure was agreed upon by the Does and the CIA. Such an award derived from the agreement of the parties, although phrased in terms of constitutional due process, would amount to specific performance of the contract that the Does allege that they had with the government — an agreement to "ensure financial and personal security for life." That type of claim falls within the exclusive jurisdiction of the Court of Federal Claims. See North Star, 14 F.3d at 37-38 (right to reformation of contract, even if phrased as statutory or constitutional right, is based on terms of contract and is therefore subject to the Tucker Act). The fact that the Court of Federal Claims has no power to grant specific enforcement of a contract does not mean that a suit for specific enforcement can be brought in district court. The Tucker Act is a limited waiver of sovereign immunity for contract actions; equitable contract remedies denied to the Court of Federal Claims are not within the waiver and may not be enforced against the United States at all. See id. at 38.
 
 
 21
 The primary claim of the Does, however, is for an injunction requiring the CIA to conduct internal hearings on their claims that comport with due process. The effect of the Tucker Act on this claim for relief depends upon the interest — life, liberty or property — that is asserted to trigger the requirement of procedural due process. One type of property interest might be argued to arise from the alleged contract between the CIA and the Does, which the Does allege guaranteed lifetime payments and protection. The District of Columbia Circuit has held that a due process claim that is triggered by a contractually-based property interest may be brought in district court, on the theory that the right sought to be enforced arises from the due process clause and is not a suit on the contract itself. See Transohio Sav. Bank v. Director, Office of Thrift Supervision, 967 F.2d 598, 610-11 (D.C.Cir.1992); Sharp v. Weinberger, 798 F.2d 1521, 1523-24 (D.C.Cir.1986). Our circuit has taken a stricter view, however, and has held that constitutional claims based on a contractual property interest fall within the Tucker Act and may not be brought in district court. See Tucson Airport Auth. v. General Dynamics Corp., 136 F.3d 641, 647-48 (9th Cir.1998) (rejecting Transohio rule); cf. North Star, 14 F.3d at 37-38. In this view, we are joined by the Second Circuit. See Up State Fed. Credit Union v. Walker, 198 F.3d 372, 377 (2d Cir.1999) (holding that district court did not have jurisdiction over any claims that could not exist independently of a contract).[4] Indeed, one district court in New York has held that a constitutional claim seeking enforcement of a CIA contract similar to that alleged by the Does, and also seeking a declaration requiring a due process hearing, was subject to the Tucker Act and could not be brought in district court. See Kielczynski v. United States CIA, 128 F.Supp.2d 151, 160 (E.D.N.Y.2001), aff'd sub nom. Kielczynski v. Does 1-2, 56 Fed. Appx. 540, 2003 WL 187164 (2d Cir.2003) (unpublished).
 
 
 22
 Perhaps because of this line of authority, the Does contend that their claim to a due process hearing is not based on their contract with the CIA. Several of the stated due process claims, however, are based in considerable part on the CIA contract, and the district court seems so to have interpreted it. These claims, for reasons we have just stated, may not be entertained by the district court. The Does, however, assert additional bases for their due process claims that do not suffer from the same jurisdictional defect.
 
 
 23
 The primary additional claim is based on an interest in liberty. The Does' claim that, regardless of the terms of their contract or whether a contract even existed, the CIA brought them into this country under conditions requiring a false identity and false history for their continuing safety. The Does allege and declare that, because of the false history and false references supplied by the CIA and the CIA's refusal to assist them further, no employment is available to them in the United States now that Mr. Doe's employment here was terminated. The failure of the CIA to provide the means for their subsistence, according to the Does, leaves them no alternative but to return to eastern Europe, where they are in danger. The district court held that the Does had raised a triable issue of fact with regard to this claim based on a liberty interest. The district court also held that these same allegations and declarations presented a triable issue of a due process violation based on the duty of the government not to act affirmatively to place a person in a dangerous situation. See Huffman v. County of Los Angeles, 147 F.3d 1054, 1059 (9th Cir.1998). Without indicating any view as to the ultimate merits of these claims, we find no error in the district court's ruling denying summary judgment and permitting these claims to go forward.[5] We also conclude that the district court is not precluded by the Tucker Act from entertaining these claims, because they are not founded upon, and do not depend on, any alleged contract between the CIA and the Does.
 
 
 24
 The Does also contend that their right to procedural due process arises from their status as persons in the PL-110 program. The government contends that the only relevant provision of that Act is 50 U.S.C. § 403h, which authorizes the Attorney General in the interest of national security to cause the admission of particular aliens as permanent residents regardless of their inadmissibility under other laws. See 50 U.S.C. § 403h. The government argues that this statute clearly creates no entitlement of the sort claimed by the Does. The Does contend, however, that other regulations and practices of the CIA establish an entitlement to continued support for persons brought into the United States pursuant to the program.
 
 
 25
 It is difficult to evaluate this claim for purposes of the Tucker Act (or for summary judgment) because the internal regulations of the CIA that have been presented are redacted, and it is not clear that all regulations that might bear on the subject have been produced. The unredacted portions of the regulations in the record do not present sufficient foundation for the Does' claim to permit them to survive summary judgment, but we do not know what is in the unredacted portions or whether other undisclosed regulations might bear on the subject.[6] Because the government relied on its right to dismissal under Totten and the Tucker Act, the record is not fully developed. Discovery has been stayed by the district court pending this appeal. Although the Does have not yet made their case on their claim of PL-110 status, a grant of summary judgment against them would be premature at this point. We therefore affirm the district court's denial of summary judgment on the due process claim based on PL-110 status. Whether that claim may be successfully maintained in further proceedings in district court will depend in part on whether the government asserts a state secrets privilege, see Part III, infra, and what disposition follows from that assertion.
 
 
 26
 We emphasize, however, that a due process claim based on PL-110 status must not depend on the alleged contract, or any other contract, between the CIA and the Does. Such a contract-based due process claim is within the exclusive jurisdiction of the Court of Federal Claims under our decision in Tucson Airport. In denying the government's motion for summary judgment on the claim based on PL-110 status, the district court stated that the claim was based "not only on the regulations, but also on promises made to them and on the surrounding circumstances. A plaintiff's property right may exist if words, conduct, or circumstances indicate a mutually explicit understanding between the parties." The Tucker Act, however, grants exclusive jurisdiction to the Court of Federal Claims over actions "founded... upon any express or implied contract with the United States." 28 U.S.C. § 1491(a). This grant encompasses claims based on "a mutually explicit understanding between the parties." If the Does are to pursue their due process claim based on PL-110 status in district court, they will have to establish a property right arising from such status that is not based on an express or implied contract.[7]
 
 
 27
 The Does also contend that CIA procedural regulations grant them a right to a fair hearing regarding their entitlement to benefits under the PL-110 program. Here again, the record may be incomplete because not all of the regulations are presented in full form. An agency is generally required to follow its own regulations. Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959). The government contends that the regulations impose no requirements on the CIA, and the unredacted portions of the regulations now in the record support the CIA's position. Here, too, it is too early in the litigation to enter a summary judgment against the Does because further proceedings, including discovery, may provide further support for their claim. If the Does' entitlement to a hearing under the regulations is based on their alleged contract with the CIA rather than a status conferred by regulation or other conditions independent of the contract, then under the principle of Tucson Airport the Tucker Act will preclude further proceedings on that claim in the district court as well.
 
 
 28
 The final claim presented by the Does is one of estoppel. The district court concluded that the Does had adequately pleaded the elements of estoppel: that the government actors knew the facts, that they intended that their conduct would be acted upon or acted in such a way that the Does had a right to believe they so intended, that the Does were ignorant of the true facts, and that they detrimentally relied on the conduct of the government actors. See Lehman v. United States, 154 F.3d 1010, 1016 (9th Cir.1998). In addition, estoppel against the government requires a showing that the government actors "engaged in affirmative conduct going beyond mere negligence and that the public's interest will not suffer undue damage as a result" of the estoppel. Id. at 1016-17 (internal quotation marks and citation omitted). The district court held that the Does had raised a triable issue of fact concerning these last two requirements. On the basis of John Doe's declaration, the district court did not err in so ruling.
 
 
 29
 Under Office of Personnel Management v. Richmond, 496 U.S. 414, 426, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990), a litigant can use estoppel defensively but not offensively against the government. See United States v. Hatcher, 922 F.2d 1402, 1409 (9th Cir.1991). Richmond's prohibition is against using estoppel offensively to obtain an award that would be contrary to a statute and would thus violate the Appropriations Clause of the Constitution. See Richmond, 496 U.S. at 424, 110 S.Ct. 2465. The Does, however, claim that payment of their subsistence is clearly authorized by statute and regulation and thus would violate no principle of Richmond or the Appropriations Clause. They also contend that their use of estoppel is similar to that authorized by this court in Watkins v. United States Army, 875 F.2d 699 (9th Cir.1989) (en banc), where we held the government estopped from preventing the plaintiff's reenlistment in the Army. Id. at 711. We conclude that the Does have made a sufficient showing to forestall summary judgment. The district court accordingly did not err in denying summary judgment on the estoppel claim.
 
 
 30
 We also conclude that the estoppel claim does not fall within the confines of the Tucker Act, because it is not founded on an express or implied contract. See Jablon v. United States, 657 F.2d 1064, 1069-70 (9th Cir.1981). Although Jablon also held that the United States had not waived its immunity from a promissory estoppel claim, id. at 1070 & n. 9, our subsequent en banc decision in Watkins supports the use of estoppel to prevent the government from denying the benefit of PL-110 status if all of the elements can be proved. The district court did not err in concluding that it had jurisdiction to entertain the estoppel claim.
 
 
 31
 We therefore conclude that the Does are not barred by the Tucker Act from proceeding on their constitutional, statutory or regulatory claims or their estoppel claim in the district court, so long as those claims are not based on the alleged contract, or any contract, between the CIA and the Does. Those claims that we have identified as being based on contract are not within the jurisdiction of the district court and must be dismissed. The district court may proceed with the remaining claims. See North Side Lumber Co. v. Block, 753 F.2d 1482, 1486 (9th Cir.1985) (holding that contractual claim must be dismissed under the Tucker Act, but other claims could go forward on remand).
 
 III
 
 32
 Resolution of this case also requires us to decide whether Totten bars judicial review of this action.
 
 
 33
 One hundred twenty-five years ago, the Supreme Court dismissed a civil war spy's case for damages for breach of a contract with the government. See Totten, 92 U.S. 105, 23 L.Ed. 605. The Agency maintains that as this case is also one by spies seeking recompense, Totten squarely governs this case. We do not agree.
 
 
 34
 Totten was indeed a landmark case, and one that retains its core vitality. But, as discussed at length below, Totten does not require immediate dismissal as to the Does' case because their claims — those that survive our Tucker Act analysis — do not arise out of an implied or express contract. Instead, the instant case is governed by the state secrets privilege, a separate aspect of the decision in Totten that has evolved into a well-articulated body of law addressing situations in which security interests preclude the revelation of factual matter in court.
 
 
 35
 Both the Supreme Court and our own court have specified the mode in which the government must invoke the state secrets privilege and the manner in which courts must apply it. And since Totten, the constitutional protection of the right to due process of law has developed into an assurance in most instances of some fair procedure, secret or open, judicial or administrative, before governmental deprivation of liberty or property becomes final. These two developments, taken together, preclude the summary dismissal of this case for which the Agency argues.
 
 
 36
 We acknowledge at the outset that it could very well turn out, after further district court proceedings, that the Does will still be left without redress even if everything they allege is true. When the government asserts that the interests of individuals otherwise subject to legal redress must give way to national security interests for the larger public good, the result can end in a balance tipped toward the greater good, with resulting unfairness to the individual litigants as the acknowledged corollary. See Bareford v. Gen. Dynamics Corp., 973 F.2d 1138, 1144 (5th Cir.1992); Fitzgerald v. Penthouse Int'l Ltd., 776 F.2d 1236, 1238 n. 3 (4th Cir. 1985); cf. Nixon v. Sirica, 487 F.2d 700, 713 (D.C.Cir.1973).
 
 
 37
 But precisely because the net result of refusing to adjudicate the Does' claims is to sacrifice their asserted constitutional interests to the security of the nation as a whole, both the government and the courts need to consider discretely, rather than by formula, whether this is a case in which there is simply no acceptable alternative to that sacrifice. The law regarding protection of national security interests in judicial proceedings provides guidance toward that end. State secrets privilege law prescribes that courts must be sure that claims of paramount national security interest are presented in the manner that has been devised best to assure their validity and must consider whether there are alternatives to outright dismissal that could provide whatever assurances of secrecy are necessary. That counterweight role has been reserved for the judiciary. We must fulfill it with precision and care, lest we encourage both executive overreaching and a corrosive appearance of inequitable treatment of those who have undertaken great risks to help our nation, an appearance that could itself have long-run national security implications.
 
 A.
 
 38
 In Totten, the estate of William A. Lloyd, a spy hired by President Abraham Lincoln to gain information on Confederate troop positions during the Civil War, brought suit in the Court of Claims to recover compensation Lloyd had allegedly been promised under his secret agreement with the President. The Supreme Court explained that the case was not justiciable because:
 
 
 39
 The service stipulated by the contract was a secret service; the information sought was to be obtained clandestinely, and was to be communicated privately; the employment and the service were to be equally concealed. Both employer and agent must have understood that the lips of the other were to be for ever sealed respecting the relation of either to the matter. This condition of the engagement was implied from the nature of the employment, and is implied in all secret employments of the government in time of war, or upon matters affecting our foreign relations, where a disclosure of the service might compromise or embarrass our government in its public duties, or endanger the person or injure the character of the agent. If upon contracts of such a nature an action against the government could be maintained ... whenever an agent should deem himself entitled to greater or different compensation than that awarded to him, the whole service in any case, and the manner of its discharge, with the details of dealings with individuals and officers, might be exposed, to the serious detriment of the public. A secret service, with liability to publicity in this way, would be impossible; and, as such services are sometimes indispensable to the government, its agents in those services must look for their compensation to the contingent fund of the department employing them, and to such allowance from it as those who dispense that fund may award.
 
 
 40
 Id. at 106-07. In applying this reasoning to the claim of the Totten estate, the Court concluded that "[t]he publicity produced by an action would itself be a breach of a contract ... and thus defeat a recovery." Id. at 107 (emphasis added).
 
 
 41
 The Agency and the dissent treat Totten as a jurisdictional bar to any case arising out of a relationship involving spy services. On this view, a court faced with any cause of action that traces back to allegations of an espionage relationship with the government must simply dismiss the complaint. We do not read Totten so broadly.
 
 
 42
 Read with care, Totten embodies two rulings. The first, often mistaken for a blanket prohibition on suits arising out of acts of espionage, is instead simply a holding concerning contract law: In Totten, the plaintiff, Lloyd, breached his contract with the President by revealing the contract's contents in his lawsuit. The Supreme Court held that because an implicit aspect of the contract was that the parties agreed to keep the very existence of the contract secret, "[t]he publicity produced by an action would itself be a breach of a contract of that kind, and thus defeat a recovery." See id.; see also Halpern v. United States, 258 F.2d 36, 44 (2d Cir. 1958) (explaining that Totten "primarily turned on the breach of contract which the Court found occurred by the very bringing of the action"); Edward J. Imwinkelried, The New Wigmore: A Treatise on Evidence § 8.2 at 1146 (2002) ("[A] close reading of [Totten] indicates that the basis for the decision was the law of contracts rather than any privilege doctrine.") (citing Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure: Evidence § 5663, at 506 & n. 39 (1992)).
 
 
 43
 For two reasons, the contractual holding of Totten is not applicable here. First, as discussed in Part II, unlike Totten, the Does do not seek only enforcement of a contract. Rather their principal concern at this point, as they explain in their brief to this court, is "to compel fair process and application of substantive law to their claims within the Central Intelligence Agency's ... internal administrative process." As the Agency is accustomed to conducting its affairs in secret, a fair internal process could presumably proceed in accordance with the secrecy implicit in an agreement to engage in espionage.
 
 
 44
 Second, Totten assumed "publicity" inconsistent with the implicit promise of secrecy as inherent in any judicial proceeding and did not consider whether there are means to conduct judicial proceedings without unacceptable attendant "publicity." Since Totten, courts, including the Supreme Court, have developed means of accommodating asserted national security interests in judicial proceedings while remaining mindful that there are circumstances in which no special procedures will be adequate to protect those interests. To the extent that the court can proceed without generating public exposure, it may be possible to fulfill any secrecy promise implicit in the agreement.
 
 
 45
 Here, the Does have so far proceeded in a manner that has not breached the agreement. They have done everything in their power not to reveal secret information: They filed suit under fictitious names and revealed only minimal, nonidentifying details in their complaint. Their attorneys for security reasons cleared their complaint with CIA officials before filing it, and received security clearances from the CIA.
 
 
 46
 With court and government cooperation, it may be possible to continue the suit in a manner that avoids public exposure of any secret information.[8] Possible measures include using in camera proceedings, sealing records, and requiring security clearances for court personnel and attorneys with access to the court records. See, e.g., Halpern, 258 F.2d at 43 (describing the availability of an in camera trial as an option when the government invoked the state secrets privilege); In re United States, 872 F.2d 472, 478 (D.C.Cir.1989) (describing options of in camera review, redaction, limited disclosure of documents, and a bench trial); Fitzgerald v. Penthouse Int'l Ltd., 776 F.2d 1236, 1243 (4th Cir.1985) ("Once the state secrets privilege has been properly invoked, the district court must consider whether and how the case may proceed in light of the privilege. The court may fashion appropriate procedures to protect against disclosure."); United States v. Musa, 833 F.Supp. 752, 758-61 (E.D.Mo.1993) (putting a protective order in place to control viewing of classified documents and requiring counsel to sign confidentiality agreement); see generally, Note, The Military and State Secrets Privilege: Protection for the National Security or Immunity for the Executive?, 91 Yale L.J. 570, 586-88, n. 90 (1982); Veronica M. Fallon, Note, Keeping Secrets from the Jury: New Options for Safeguarding State Secrets, 47 Fordham L.Rev. 94, 109-13 (1978); cf. Guerra v. Board of Trs., 567 F.2d 352, 355 (9th Cir.1977) (describing methods court could use to protect confidentiality including in camera review, sealing of records, and deletion of names); Classified Information Procedures Act (CIPA), Pub.L. 96-456, 94 Stat.2025 (Oct. 15, 1980), 18 U.S.C. app. III § 1 et seq. (providing procedures for use of privileged information as evidence in criminal trials); Neil A. Lewis, After Sept. 11, a Little Known Court has a Greater Role, N.Y. Times, May 3, 2002, at A20 (describing the Foreign Intelligence Surveillance Court and its procedures for approving wiretaps without jeopardizing national security or releasing state secrets).
 
 
 47
 Thus, Totten's holding with regard to enforcement of the secrecy aspect of contracts for spy services should not entirely preclude further proceedings in this suit. And with some creativity in devising flexible procedures such as those suggested by courts that have grappled with these issues in the century and a quarter since Totten, it may prove possible to resolve the essential issues through court processes. That is not to say that such in camera review would always be justified or permissible, but only that it would not be precluded on a breach of contract theory.
 
 B.
 
 48
 The other element of Totten is an early expression of the evidentiary state secrets privilege: "[P]ublic policy forbids the maintenance of any suit in a court of justice, the trial of which would inevitably lead to the disclosure of matters which the law itself regards as confidential, and respecting which it will not allow the confidence to be violated." Totten, 92 U.S. at 107 (emphasis added). This public policy principle has flowered into the state secrets doctrine of today. It is principally in this context that the Supreme Court has reaffirmed Totten's currency. See United States v. Reynolds, 345 U.S. 1, 7 n. 11, 73 S.Ct. 528, 97 L.Ed. 727 (1953) (citing Totten for support of the "well established" military secrets privilege); Jencks v. United States, 353 U.S. 657, 670 n. 16, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957) (citing Reynolds and Totten for general principle that government documents may be privileged on basis of national interest); Rubin v. United States, 525 U.S. 990, 992, 119 S.Ct. 461, 142 L.Ed.2d 413 (1998) (Breyer, J., dissenting from denial of cert.) (citing Totten for state secrets privilege).
 
 
 49
 This court has so recognized. Our leading recent case construing Totten treats Totten as a state secrets case, albeit one of a special variety. See Kasza v. Browner, 133 F.3d 1159, 1166-67 (9th Cir.1998).
 
 
 50
 In Kasza, we noted that "[t]he state secrets privilege is a common law evidentiary privilege that allows the government to deny discovery of military secrets," id. at 1165, and further noted that invoking the privilege requires certain formalities (discussed below in part III.C). We then stated that "[o]nce the privilege is properly invoked and the court is satisfied as to the danger of divulging state secrets ... [t]he application of the state secrets privilege can ... have three effects," one of which is "dismiss[ing] the plaintiff's action based solely on the invocation of the state secrets privilege." Id. at 1166 (emphasis added). For the latter point, Kasza cited, inter alia, Totten. Kasza, 133 F.3d at 1166.
 
 
 51
 Kasza then went on to apply its analysis to the facts of the case before it, investigating whether the privilege was "properly asserted and, even if properly asserted, [whether] the ... invocation of the privilege was overbroad." Id. at 1168. Concluding that the government defendant had "satisfied the formal requirements necessary to invoke the privilege," id. at 1169, we determined that "in camera review of ... classified declarations was an appropriate means to resolve the ... scope of the state secrets privilege." Id. After conducting that in camera review, we decided, quoting Totten, that Kasza, like Totten, was a case in which "`the trial ... would inevitably lead to the disclosure of matters which the law itself regards as confidential,'" because "the very subject matter of Frost's action is a state secret." Kasza, 133 F.3d at 1170.
 
 
 52
 It is therefore the law of this circuit that Totten permits dismissal of cases in which it is asserted that the very subject matter is a state secret only after complying with the formalities and court investigation requirements that have developed since Totten within the framework of the state secrets doctrine.[9] This understanding of the role of Totten in the contemporary legal world comports with both Totten and later Supreme Court authority. Totten relied on other well-established privileges, such as the spousal privilege, attorney-client privilege, doctor-patient privilege, and clergy-penitent privilege, as a basis for its holding with regard to national secrets. See Totten, 92 U.S. at 107. Moreover, it is primarily in the context of the state secrets privilege that the Supreme Court in recent years has affirmatively cited to Totten.
 
 
 53
 The Agency relies on Weinberger v. Catholic Action of Hawaii/Peace Education Project, 454 U.S. 139, 102 S.Ct. 197, 70 L.Ed.2d 298 (1981) for its contrary view of Totten as a free-floating, expansive doctrine of its own, divorced from the later development of the state secrets privilege. Kasza, however, was decided well after Weinberger, so Kasza is binding on us regarding the modern role of the Totten doctrine.
 
 
 54
 Further, Weinberger concerned in the main an explicit statutory exemption to the Freedom of Information Act ("FOIA"). See Weinberger, 454 U.S. at 144, 102 S.Ct. 197. FOIA analysis is governed strictly by statute, while the state secrets privilege is governed solely by judge-made law. Also, FOIA cases involve a determination of what information can be released to the public without any restriction on the information's dissemination. In contrast, the state secrets privilege governs what material can be used by individual litigants who need such information to make their cases, under such restrictions of access as may be necessary, including in camera review, closed proceedings, and sealed records. Weinberger therefore dealt principally with the substantive question whether the sensitive material at issue could be made public and only as a subsidiary matter with the handling of that material within the confines of litigation.
 
 
 55
 Weinberger did refer to Totten at the end of the opinion as an explanation, by analogy, concerning why the National Environmental Policy Act ("NEPA") inquiry could not go forward in court. It also referred, however, in the same context, to Reynolds, the seminal state secrets privilege case. Weinberger, 454 U.S. at 147, 102 S.Ct. 197. The brief reference to Totten in Weinberger therefore cannot be read as prescribing the application of Totten without regard to the later-developed state secrets privilege doctrine, and Kasza evidently did not so read it.
 
 
 56
 We therefore conclude that Totten is applicable to the case before us only as applied through the prism of current state secrets doctrine.
 
 C.
 
 57
 To invoke the state secrets privilege, a formal claim of privilege must be "lodged by the head of the department which has control over the matter, after actual personal consideration [of the evidence] by that officer." Reynolds, 345 U.S. at 7-8, 73 S.Ct. 528 (footnotes omitted); see also Kasza, 133 F.3d at 1165. After that, "[t]he court itself must determine whether the circumstances are appropriate for the claim of privilege." Reynolds, 345 U.S. at 8, 73 S.Ct. 528; see also Kasza, 133 F.3d at 1165. The government has not thus far asserted the state secrets privilege in this case and has therefore not complied with the required procedures.[10]
 
 
 58
 This initial matter is one of formalities, true. But formalities often matter a great deal, and they certainly matter here. As Kasza noted, "dismissal of an action based on the state secrets privilege is harsh," but sometimes "the greater public good — ultimately the less harsh remedy — [is] dismissal." Id. at 1167 (internal citation and quotation marks omitted). Determining when we must ask individuals to bear the brunt of our national interest is a matter of profound moral importance. We therefore require that the government address the question in a manner commensurate with its gravity.
 
 
 59
 Additionally, there are practical reasons for insisting upon compliance with the formalities established by the state secrets privilege. There is always the possibility that subordinate officials have a motive to seek dismissal of an action based on state secrets considerations because they themselves, or someone under their supervision, would be exposed as having acted unfairly or illegally if the case went forward. Also, invocation of the state secrets privilege can have adverse as well as salutary effects on national security interests. If persons contracting with the government on matters involving the national security — spies, yes, but also suppliers of military and espionage-related goods and services — come to expect that promises cannot be enforced, their willingness to offer their services may in the long run dissipate.
 
 
 60
 For all these reasons, the state secrets privilege "is not to be lightly invoked." Reynolds, 345 U.S. at 7, 73 S.Ct. 528. If we are to inflict upon individuals otherwise protected by our laws, particularly the United States Constitution, the harsh remedy of dismissal to protect the rest of us, we must do so only after the individual responsible for the national security interest at stake personally reviews the matter, and only after he or she concludes and certifies that there is indeed a national security basis for refusing to allow any form of court consideration of the facts necessary to adjudicate the dispute. It is invocation at that level of the executive hierarchy, and with that degree of personal assurance, that lessens the possibility of reflexive invocation of the doctrine as a routine way to avoid adverse judicial decisions. Invocation at that level of the executive hierarchy therefore underlies the "utmost deference" accorded state secrets claims. See Kasza, 133 F.3d at 1166.
 
 
 61
 The government has not complied here with the formalities essential to invocation of the state secrets privilege. That is reason enough to affirm the district court's refusal to dismiss this case.
 
 D.
 
 62
 Given our holdings that the Tucker Act does not preclude the bringing of some of the Does' claims in the district court, and that Totten does not jurisdictionally preclude the lawsuit before us, we provide some guidance concerning the handling of the remaining claims should the state secrets privilege be invoked.
 
 
 63
 In Reynolds, the Court emphasized that judges must carefully review assertions of the state secrets privilege before approving the privilege. See Reynolds, 345 U.S. at 9-10, 73 S.Ct. 528; see also Jencks, 353 U.S. at 676, 77 S.Ct. 1007 (Burton, J., concurring). "Judicial control over the evidence in a case cannot be abdicated to the caprice of executive officers." Reynolds, 345 U.S. at 9-10, 73 S.Ct. 528; see also In re United States, 872 F.2d at 475; Ellsberg v. Mitchell, 709 F.2d 51, 58 (D.C.Cir.1983); 8 Wigmore on Evidence § 2379 at 809-10 (McNaughton Rev.1961) ("A court which abdicates its inherent function of determining the facts upon which the admissibility of evidence depends will furnish bureaucratic officials too ample opportunities for abusing the [state secrets] privilege."); James Zagel, The State Secrets Privilege, 50 Minn L.Rev. 875, 900 (1966); Raoul Berger & Abe Krash, Government Immunity from Discovery, 59 Yale L.J. 1451, 1463 (1950).
 
 
 64
 More specifically, before approving the application of the privilege, the district court must be convinced by the Agency that there is a "reasonable danger" that military or national secrets will be revealed. Reynolds, 345 U.S. at 10-11, 73 S.Ct. 528. The state secrets privilege is an absolute privilege and cannot be overcome by a showing of necessity. Nonetheless, the greater the party's need for the evidence, the more deeply a court must probe to see whether state secrets are in fact at risk. Reynolds, 345 U.S. at 11, 73 S.Ct. 528; Ellsberg, 709 F.2d at 58-59.
 
 
 65
 As discussed at length previously, there are numerous safeguards courts can use to protect secret material from public exposure. The standard practice when evaluating claims that the state secrets privilege applies is to conduct in camera and ex parte review of documents. See Kerr v. United States, 426 U.S. 394, 405-06, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976) (citing Nixon, 418 U.S. at 706, 94 S.Ct. 3090 and Reynolds, 345 U.S. at 1, 73 S.Ct. 528); Kasza, 133 F.3d at 1166, 1169; In re United States, 872 F.2d at 475, 478-79; Ellsberg, 709 F.2d at 59.
 
 
 66
 In addition, unprivileged material can and must be separated from the privileged material. See Kasza, 133 F.3d at 1166 ("[W]henever possible, sensitive information must be disentangled from nonsensitive information to allow for the release of the latter.") (quoting Ellsberg, 709 F.2d at 57); In re United States, 872 F.2d at 475-76 ("The `broad sweep' of the [state secrets] privilege, likewise requires that the privilege not be used to shield any material not strictly necessary to prevent injury to national security....") (citing Ellsberg, 709 F.2d at 57). Finally, sealing of records and secret hearings are possible ways to adjudicate issues without public exposure of state secrets. See, e.g., Halpern, 258 F.2d at 43; In re United States, 872 F.2d at 478. Where, as here, the government is seeking complete dismissal of the action for national security reasons, a court should consider these possibilities before determining that there is no way both to adjudicate the case and to protect state secrets.
 
 
 67
 Webster v. Doe, 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988), confirms that particularly where constitutional claims are at issue, the Reynolds inquiry requires courts to make every effort to ascertain whether the claims in question can be adjudicated while protecting the national security interests asserted. In Webster, a discharged CIA covert employee, Doe, was allowed to go forward with his constitutional challenge to the CIA's denial of his security clearance. 486 U.S. at 604-05, 108 S.Ct. 2047. It is no accident that the case was called Webster v. Doe. In Webster, as here, the fact of the relationship with the CIA was secret. As the Court of Appeals in the case that became Webster explained, "John Doe [was] proceeding under a pseudonym only because his status as a CIA employee cannot be publicly acknowledged, not because of any embarrassment about his homosexuality." Doe v. Casey, 796 F.2d 1508, 1512 n. 2 (D.C.Cir. 1986). So with regard to the secrecy of the relationship, the circumstances were the same as those present here.
 
 
 68
 Noting that a "serious constitutional question" would arise if consideration of Doe's constitutional claims were foreclosed, Webster permitted the constitutional causes of action to go forward despite the secrecy of the relationship. 486 U.S. at 603-05, 108 S.Ct. 2047 (citing Bowen v. Michigan Acad. of Family Physicians, 476 U.S. 667, 681 n. 12, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986)). In so doing, the Court recognized that issues of national security could arise in the course of the litigation, necessitating special litigation procedures. Given the constitutional nature of the cause of action, however, the Court rejected the contention that the case should be dismissed out of hand. Instead, the Court instructed that "the District Court has the latitude to control any discovery process which may be instituted so as to balance respondent's need for access to proof which would support a colorable constitutional claim against the extraordinary needs of the CIA for confidentiality and the protection of its methods, sources, and mission[,]" citing, inter alia, Reynolds. Webster, 486 U.S. at 604, 108 S.Ct. 2047.
 
 
 69
 Webster indicates that where constitutional issues are raised, the courts must consider the full panoply of alternative litigation methods outlined above — in camera review, sealed records, and, if necessary, secret proceedings — before concluding that the only alternative is to dismiss the case and thereby deny the plaintiff's claimed constitutional rights. The only obvious differences between Webster and this case for present purposes is that the Doe in the Webster case was a domestic employee while the Does in this case are foreigners who were engaged to spy for the United States abroad. Absent some reason nationality and location distinctions should matter, and the government has suggested none, Webster requires that the constitutional nature of the Does' cause of action weigh heavily in applying the Reynolds state secrets privilege standard.
 
 
 70
 Applying that standard with the requisite care, we note first, once again, that the Does have alleged both property and liberty interests, including the endangerment of their lives, the interference with their ability to pursue employment, the failure to fulfill the obligations of the PL-110 program, and an estoppel theory. If true, these interests could constitute legitimate liberty and property rights for purposes of the Fifth Amendment. See Board of Regents of State Colls. v. Roth, 408 U.S. 564, 573, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).
 
 
 71
 Further, unlike the plaintiff in Webster, the Does primarily seek due process within the agency, not before the courts. The central constitutional issue in this case, the procedural due process cause of action, therefore is one that, unlike some of the constitutional causes of action alluded to in Webster, should not require factual development in court of the details underlying the dispute. Rather, to make out their procedural due process claim, the Does will need to demonstrate only that they had a relationship with the CIA that could potentially establish an entitlement to continued assistance or payments.
 
 
 72
 For several reasons, it is not self-evident that the Does, in order to establish such a relationship, will need to jeopardize state secrets:
 
 
 73
 First, the relationship may not truly be secret. It is widely known that the CIA contracts for spy services, and in particular that the CIA recruits foreign spies. It is also public knowledge that many of these foreign recruits are provided permanent residency in the United States along with other compensation for their services. See, e.g., Federal Government's Handling of Soviet and Communist Bloc Defectors: Hearing Before the Permanent Subcomm. on Governmental Affairs, U.S. Senate, 100th Cong., 100-02, 174-75 (1987) (describing support under Pub.L. No. 81-110 (1949) for defectors with information of great import to United States' interests); 50 U.S.C. § 403h (2002) (providing for the admission of aliens to this country when it is "in the interest of national security or essential to the furtherance of the national intelligence mission"). Furthermore, the complaint alleges that the CIA sent a letter to the Does admitting a relationship and stating that the Agency was unable to continue supporting the Does because of "budget constraints." See Letter from Nancy Clayborne (June 5, 1997). The existence of such a letter could be evidence that the Does' past relationship with the CIA is not now clandestine.
 
 
 74
 Second, it is possible that, if a claim of privilege is made, the district court might conclude that the Agency has not provided any basis for concluding that national security would be jeopardized by the revelation of the existence of a relationship with the Does. A substantial time has passed since the agreement with the Does was formed, and we are no longer "at war," "cold" or otherwise, with the Does' country of origin. When evaluating the invocation of the state secrets privilege, the district court must give the "utmost deference" to the government's evaluation of what constitutes a state secret that will jeopardize national security. Kasza, 133 F.3d at 1166. Such deference, however, does not entirely obviate the CIA's need to make a minimally coherent explanation to the court concerning why simply admitting to a relationship with the Does could conceivably jeopardize national security.
 
 
 75
 Finally, because of the limited nature of a procedural due process inquiry, the specifics of the Does' relationship with the CIA — such as the place and manner in which they were recruited, their contacts, and the nature of the espionage — should not need to be revealed. Rather the evidentiary inquiry can be tailored to determine whether the alleged relationship with the CIA in fact existed and, if so, whether the resulting relationship gave rise to a legally cognizable property or liberty interest.
 
 
 76
 As to whether the CIA's procedures adequately protect any such interest, it is not clear that the agency will claim a secrecy interest in those internal procedures. If it does, the court may well be able to review the available procedure for consistency with constitutional standards in proceedings not open to the public.
 
 
 77
 It is worth emphasizing that the procedural due process cause of action seeks an alternative, secret way of adjudicating the merits of the Does' claims. Assuming the plaintiffs' allegations are true, as we must when evaluating a motion to dismiss, the outright dismissal of the Does' complaint would assuredly deny them their constitutional right to procedural due process, by foreclosing any review of the merits of their claim. Before depriving the Does of all due process, the possible availability of a truncated judicial inquiry, with the primary merits adjudication relegated to the agency, is an approach that merits careful scrutiny.
 
 
 78
 It is therefore possible that, after the most careful, respectful, and deferential inquiry, the district court could conclude that the Does' case may go forward in some manner, whether in open court or closed, without jeopardizing any state secrets. Accordingly, this case should be remanded to the district court for further proceedings consistent with the current law on the state secrets privilege, and with this opinion.[11]
 
 
 79
 The national interest normally requires both protection of state secrets and the protection of fundamental constitutional rights. Here, the CIA has not invoked the state secrets privilege nor has the district court had the opportunity independently to review the invocation of such a privilege. We should not precipitously close the courthouse doors to colorable claims of the denial of constitutional rights. The Does' case must therefore be remanded to the district court to provide the Agency the opportunity to formally invoke the state secrets privilege. If the Agency chooses to do so, the district court must then, after careful inquiry and consideration of alternative modes of adjudication, and with the utmost deference to the government's determination of national security interests, evaluate whether any aspect of the Does' case can go forward.
 
 
 80
 Costs on appeal are awarded to the appellees.
 
 
 81
 AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
 
 
 
 Notes:
 
 
 *
 Pursuant to General Order 3.2g, Judge Berzon was drawn to replace Judge Henry A. Politz. Judge Berzon has read the briefs, reviewed the records, and listened to the tape of oral argument
 
 
 **
 Part II of the opinion is authored by Judge Canby
 
 
 [1]
 PL-110 refers to the original public law number of the Central Intelligence Act of 1949. As used by the parties to this litigation, PL-110 refers to an alleged program emerging from a section of that statute, now codified at 50 U.S.C. § 403h:
 Whenever the Director [of Central Intelligence], the Attorney General, and the Commissioner of Immigration and Naturalization shall determine that the admission of a particular alien into the United States for permanent residence is in the interest of national security or essential to the furtherance of the national intelligence mission, such alien and his immediate family shall be admitted to the United States for permanent residence without regard to their inadmissibility under the immigration or any other laws and regulations, or to the failure to comply with such laws and regulations pertaining to admissibility: Provided, That the number of aliens and members of their immediate families admitted to the United States under the authority of this section shall in no case exceed one hundred persons in any one fiscal year.
 
 
 [2]
 The district court granted the CIA's motion to dismiss in part, holding that the Does had failed to allege facts demonstrating that the Agency had subjected them to unequal treatment in violation of the Fifth Amendment
 
 
 [3]
 The Tucker Act does not specify that the jurisdiction of the Court of Federal Claims over contract claims in excess of $10,000 is exclusive, but courts have referred to the Tucker Act's grant of exclusive jurisdiction as a shorthand way of recognizing that Congress has waived sovereign immunity for such claims only for actions brought in the Court of Federal ClaimsSee, e.g., Transohio Sav. Bank v. Director, Office of Thrift Supervision, 967 F.2d 598, 608-09 (D.C.Cir.1992).
 
 
 [4]
 Our decisions inTucson Airport and North Star, and the Second Circuit's decision in Up State, involved plaintiffs who sought by invoking a constitutional claim to secure rights guaranteed by the contract. Such actions are more directly contractual than those brought by the Does, who do not seek to enforce the contract in district court but merely to force the CIA to hold a hearing that meets the requirements of procedural due process. Our ruling in Tucson Airport, however, is broad enough to cover the present case:
 [B]ecause General Dynamic's constitutional claims are contractually-based, the district court lacks jurisdiction under the Tucker Act. All three constitutional claims are premised on the notion that the United States has some contractual obligation to General Dynamics under the Modification Center Contract that it has failed to satisfy. If the Modification Center Contract imposes no such obligation, the United States owes no duty to General Dynamics giving rise to an alleged constitutional violation. Because the United States's obligation is in the first instance dependent on the contract, these claims are contractually-based.
 Tucson Airport, 136 F.3d at 647. This rationale, by which we are bound, applies to any due process claim of the Does that is based on their contract with the CIA.
 
 
 [5]
 We emphasize that this litigation is in a very early stage and full-fledged discovery has not yet begun. If, in further proceedings, the state of the evidence on this claim or any other claim that we permit to go forward becomes such that no rational trier of fact could find for the Does, nothing we say here prevents a renewed motion for summary judgment on the part of the CIA
 
 
 [6]
 The record contains a declaration from a CIA official that "I can inform the court unequivocally that there are no Agency or other federal regulations that require the CIA to provide lifetime subsistence assistance to individuals brought into the United States under the authority of PL-110. Neither PL-110, nor any other law, statute, regulation, internal policy, unstated principle or anything else has ever before, or does now, obligate the Agency to provide any form of lifetime financial assistance to individuals brought into the United States by CIA under the authority of PL-110."
 The district court interpreted the first sentence above as a declaration that the official's search revealed no Agency or other federal regulations that require the CIA to provide lifetime subsistence. The court disregarded the legal conclusions set forth in the second sentence.
 
 
 [7]
 The Does ultimately have the burden of showing entitlement. If a state secret privilege is asserted and the district court concludes that the evidence required to support the Does' claim is denied them because of the privilege, then the Does' claim will fail, as we explain below in discussing theTotten issue.
 
 
 [8]
 In camera court review is routinely considered consistent with assertions of the need for secrecy. Cf. Loral Corp. v. McDonnell Douglas Corp., 558 F.2d 1130, 1132 (2d Cir.1977) (invocation of state secrets privilege does not preclude court review of documents in camera). Review by the court in camera of a contract or other materials claimed to be secret is no different from in camera review of allegedly secret materials in a trade secrets case, or of evidence asserted to be subject to the attorney-client privilege. In such situations, a court's in camera inspection to determine whether a privilege applies is not itself a breach of the privilege. See, e.g., United States v. Zolin, 491 U.S. 554, 568-69, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989) (privileges survive in camera review); In re Perrigo Co., 128 F.3d 430, 441 (6th Cir.1997) (no waiver of attorney-client privilege by submitting documents to the court for in camera review); Burlington N.R. Co. v. Omaha Pub. Power Dist., 888 F.2d 1228, 1232 (8th Cir.1989) (contract alleged to be trade secret could be reviewed in camera without revealing trade secret); see also Anderson v. Dep't of Health and Human Serv., 907 F.2d 936, 942 (10th Cir.1990) (in camera review by court of documents to determine if material could be released to public under the Freedom of Information Act ("FOIA") does not equate with release to the public). Just as privileges are not waived and secrets not considered revealed in other contexts by in camera review, a court's review of documents in camera here would not breach any obligation the Does may have to keep the agreement secret.
 
 
 [9]
 Other circuits have similarly treatedTotten as the progenitor of the state secrets doctrine, now subject to later-enunciated standards governing recognition of the privilege. See Clift v. United States, 597 F.2d 826, 828-30 (2d Cir.1979) (holding that a case analogous to Totten should be analyzed under the state secrets privilege, and that the case could go forward even though revealing the underlying subject of the lawsuit, a secret patent, was barred by the privilege); United States v. Ehrlichman, 376 F.Supp. 29, 32 n. 1 (D.D.C. 1974) (citing Nixon v. Sirica, 487 F.2d 700, 713 (D.C.Cir.1973)) (describing the modification of Totten "by a century of legal experience, which teaches that the courts have broad authority to inquire into national security matters so long as proper safeguards are applied to avoid unwarranted disclosures"). The Federal Circuit appears to have conflicting authority on the application of Totten. Compare McDonnell Douglas Corp. v. United States, 323 F.3d 1006, 1021 (Fed.Cir.2003) (citing to Totten, 92 U.S. at 107, for proposition that "when the `very subject matter of the action' is a state or military secret, the action must give way to the proper invocation of the state secrets privilege." (emphasis added)) with Guong v. United States, 860 F.2d 1063, 1066 (Fed.Cir.1988) ("A close reading of Reynolds reveals that it does not limit or modify the authority of Totten.").
 
 
 [10]
 On remand, the government should be given the opportunity before the case proceeds further to assert the state secrets privilege should it choose to do so
 
 
 [11]
 Both the government and the dissent suggest that judges are not well suited to make evaluations of national security even of the most deferential sort. Once the government asserts the state secrets privilege, the dissent contends, a district court should go no further. That short-circuited approach is not the law, asKasza makes clear. See Kasza, 133 F.3d at 1169-70; see also McDonnell Douglas Corp., 323 F.3d at 1023 (affirming the trial court's dismissal of a claim under the state secrets privilege only after the trial court had reviewed the material supporting the invocation of the privilege). Although a district court must almost always defer to the government's evaluation of what constitutes a state secret and why, a district court cannot simply rubber stamp the government's conclusions.
 The dissent mistakenly relies on CIA v. Sims, 471 U.S. 159, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985) for its contrary proposition. Sims was a suit under FOIA in which a statutory exemption applied and allowed the government to withhold requested information. Id. at 168, 105 S.Ct. 1881. As discussed with regard to Weinberger, FOIA cases require a different calculus than cases involving invocation of the state secrets privilege, as the remedy sought is public disclosure. Furthermore, the Sims court did in fact conduct some, albeit minimal, review of the documents at issue. See id. at 165, 173, 105 S.Ct. 1881 (discussing with approval the district court's consideration of agency affidavits and evidence used to support the decision to withhold documents under FOIA).
 
 
 TALLMAN, Circuit Judge, dissenting:
 
 82
 It is the prerogative of the Supreme Court, not ours, to decide whether Totten v. United States, 92 U.S. 105, 23 L.Ed. 605 (1875), continues to bar judicial review of actions arising from espionage services performed for the United States by secret agents, or whether the Totten doctrine has somehow been supplanted by the modern state secrets evidentiary privilege articulated in United States v. Reynolds, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953). My colleagues proclaim that Totten is "applicable to the case before us only as applied through the prism of current state secrets doctrine." Maj. Op. at 1151. But Totten holds that claims brought by secret agents against the government are non-justiciable. Reynolds, on the other hand, protects against the unveiling of state secrets during the prosecution of an otherwise recognized cause of action. Far from modifying Totten, the Court's opinion in Reynolds reaffirms Totten's jurisdictional bar.
 
 
 83
 Furthermore, the majority fails to recognize the jurisdictional limitation imposed on the Does' lawsuit by the Tucker Act, which requires that this suit be brought in the Court of Federal Claims. Because the court's opinion is contrary to the clear rule announced in Totten, and ignores the limitations on our jurisdiction imposed by the Tucker Act, I respectfully dissent.
 
 
 84
 * In Totten, the estate of William A. Lloyd, a spy hired by President Abraham Lincoln to gain information on Confederate troop positions during the Civil War, sought to recover in the Court of Claims compensation Lloyd had allegedly been promised under his secret agreement with the President. 92 U.S. at 105-06. The Supreme Court upheld the lower court's dismissal of the suit, concluding that the very nature of the contract foreclosed a suit for its enforcement. Id. at 107. In language directly applicable to the Does, the Court explained why such cases are not justiciable:
 
 
 85
 The service stipulated by the contract was a secret service; the information sought was to be obtained clandestinely, and was to be communicated privately; the employment and the service were to be equally concealed. Both employer and agent must have understood that the lips of the other were to be for ever sealed respecting the relation of either to the matter. This condition of the engagement was implied from the nature of the employment, and is implied in all secret employments of the government in time of war, or upon matters affecting our foreign relations, where a disclosure of the service might compromise or embarrass our government in its public duties, or endanger the person or injure the character of the agent. If upon contracts of such a nature an action against the government could be maintained ... whenever an agent should deem himself entitled to greater or different compensation than that awarded to him, the whole service in any case, and the manner of its discharge, with the details of dealings with individuals and officers, might be exposed, to the serious detriment of the public.
 
 
 86
 Id. at 106-07.
 
 
 87
 The rule in Totten is not limited to breach of contract claims brought by those providing secret services to the government. Expanding its holding beyond the contract analysis, the Totten Court reasoned that "general principle[s] [of] public policy forbid[] the maintenance of any suit in a court of justice, the trial of which would inevitably lead to the disclosure of matters which the law itself regards as confidential, and respecting which it will not allow the confidence to be violated." Id. at 107 (emphasis added). Implicit in the Court's public policy holding is an understanding that fundamental principles of separation of powers prohibit judicial review of secret contracts entered into by the Executive Branch in its role as guardian of national security. See id. at 106 (discussing the President's powers as Commander in Chief); see also Dept. of the Navy v. Egan, 484 U.S. 518, 527, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988) (stating that the authority to protect national security information falls to the President as Commander-in-Chief of the armed services and head of the Executive Branch of government.).
 
 
 88
 There is a key distinction between spy cases like Totten and other classes of cases where Congress has provided an express remedy for relief. In the latter, the evidentiary privilege known as "state secrets" may properly be invoked to block otherwise relevant discovery in a recognized cause of action. An example is United States v. Reynolds. In Reynolds, the Supreme Court considered — in the context of a tort claim discovery dispute — the protection afforded to discovery of evidence that would reveal state secrets. Id. at 3, 73 S.Ct. 528 (noting that "an important question of the Government's privilege to resist discovery [was] involved").
 
 
 89
 Reynolds arose from the unfortunate crash of a military plane while it was testing secret electronic equipment. Id. at 2-3, 73 S.Ct. 528. The plaintiffs were three widows of civilian observers aboard the plane who died in the crash. Id. at 3, 73 S.Ct. 528. In an attempt to obtain discovery in support of their claim against the government under the Federal Tort Claims Act ("FTCA"),[1] the plaintiffs moved pursuant to Rule 34 of the Federal Rules of Civil Procedure for production of the Air Force accident investigation report and the statements of the three surviving crew members taken in connection with that investigation. Id. The government moved to quash, claiming that Air Force regulations rendered the information privileged against disclosure. Id. at 3-4, 73 S.Ct. 528.
 
 
 90
 The district court rejected the government's claim, finding that the enactment of the FTCA waived the claimed privilege. Id. at 4, 73 S.Ct. 528. After the district court had already rendered its decision, it received a letter from the Secretary of the Air Force stating that the release of the information would "not be in the public interest." Id. The district court reheard the matter, after which the Secretary of the Air Force filed a formal claim of privilege asserting that the aircraft and its personnel were engaged in a secret mission at the time of the crash. Id. Because of the secret nature of the mission, the government refused to produce the requested documents. Id. at 5, 73 S.Ct. 528. The court, unable to determine whether the documents contained privileged matter, directed that the issue of negligence be decided in the plaintiffs' favor. Id. The government appealed and the court of appeals affirmed. Id.
 
 
 91
 On certiorari, the Supreme Court viewed Reynolds as presenting "an important question of the Government's privilege to resist discovery." Id. at 3, 73 S.Ct. 528 (emphasis added). The Court made clear that the "essential question" in Reynolds was whether the Government asserted a valid claim of privilege releasing it of its obligation to produce documents otherwise discoverable under Federal Rule of Civil Procedure 34. Id. at 6, 73 S.Ct. 528. The Court held that before the government can withhold relevant evidence under the state secrets privilege, it must first file a "formal claim of privilege, lodged by the head of the department which has control over the matter"[2] and there must be a judicial determination that "the circumstances are appropriate for the claim." Id. at 7-8, 73 S.Ct. 528.
 
 
 92
 Contrary to the majority's reasoning, Reynolds did not alter the long-standing rule announced in Totten barring judicial review where the very subject matter of the suit is a state secret. The Supreme Court's opinion in Reynolds refers to Totten only twice. The most important reference occurs at footnote 26 where the Court expressly distinguished the Totten-type of case from the situation presented in Reynolds. There, the Court acknowledged that Totten is a different kind of case, one "where the very subject matter of the action, a contract to perform espionage, was a matter of state secret." Reynolds, 345 U.S. at 11 n. 26, 73 S.Ct. 528. For Totten cases, the Court observed that "[t]he action [is] dismissed on the pleadings without ever reaching the question of evidence...." Id. (emphasis added).
 
 
 93
 The only other reference Reynolds makes to Totten is found at footnote 11. There, the Court cited Totten for the proposition that public policy supports the invocation of evidentiary privileges to exclude evidence in instances where the law regards matters to be confidential. Id. at 7 n. 11, 73 S.Ct. 528. Footnote 11 does not suggest that the Totten doctrine has somehow evolved from a jurisdictional bar into an evidentiary rule of privilege, as the majority reasons. Rather, Totten expressly acknowledges that there is a higher need to protect the disclosure of a contract for secret services with the government where the very existence of the arrangement is itself the secret not to be disclosed. Totten, 92 U.S. at 107.
 
 
 94
 While Totten and Reynolds are closely related in that both protect a state secret from disclosure, the rules announced in those cases differ in subtle but important respects. Most importantly, the state secrets privilege in Reynolds permits the government to withhold otherwise relevant discovery from a recognized cause of action (e.g., an FTCA case), while the Totten doctrine permits the dismissal of a lawsuit because it is non-justiciable before such evidentiary questions are ever reached.
 
 
 95
 Our holding in Kasza v. Browner, 133 F.3d 1159 (9th Cir.1998), supports this conclusion. Kasza involved a recognized cause of action under the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. § 6972. The appeal was consolidated from two closely related cases, one against the Environmental Protection Agency, and the other against the Air Force, seeking to compel compliance with hazardous waste inventory, inspection, and disclosure responsibilities at a secret installation in Nevada. Kasza, 133 F.3d at 1162. During the discovery phase of the litigation, the Air Force refused to furnish almost all of the information sought by the plaintiffs, claiming it was privileged because enemies of the United States could determine what secret activities the Air Force was conducting if information associated with the operation was disclosed. Id. at 1163. The district court granted summary judgment in favor of the Air Force, finding that the formal invocation of the state secrets privilege blocked the discovery requested and made trial impossible by effectively preventing the plaintiffs from establishing a prima facie case for any of their claims. Id. at 1162-63.[3] We affirmed. Id. at 1163.
 
 
 96
 In Kasza, we relied on the Reynolds rule that "the state secrets privilege is a common law evidentiary privilege that allows the government to deny discovery of military secrets." Id. at 1165. After reviewing the applicable law, we reasoned that the application of the state secrets privilege can have different effects, depending on whether it is used to exclude evidence or to dismiss a cause of action. Id. at 1166. First, we found that the government's invocation of the privilege over particular evidence may completely remove the evidence from the case. Id. If a plaintiff cannot make out her prima facie case without the secret evidence, the court may dismiss her claim. Id. Second, the privilege may deprive a defendant of information that would otherwise give the defendant a valid defense to the claim. Id. In these cases, the court may grant summary judgment to the defendant. Id.
 
 
 97
 In the first two categories, before the state secrets privilege can be applied in an otherwise justiciable case, there must be a formal claim of privilege followed by judicial review to determine whether the circumstances are appropriate for its invocation. Id. at 1165-66. After the court has decided what evidence is unavailable as a result of the application of the privilege, the court must determine whether the plaintiff is still able to establish a prima facie case or whether the defendant can prove up a defense in light of the court's exclusionary ruling. Id. at 1166. In Kasza, we found that the plaintiffs' RCRA claims could not be proven without the documents withheld as privileged, and therefore summary judgment was appropriate. Id. at 1170 ("[T]he state secrets privilege bar[s] [the plaintiffs] from establishing [a] prima facie case....").
 
 
 98
 Finally, we addressed the third category of cases where the "very subject matter of the action" is a state secret. Id. at 1166. We found that in these cases there is no need to evaluate a plaintiff's ability to produce nonprivileged evidence. Instead, "the court should dismiss [a] plaintiff's action based solely on the invocation of the state secrets privilege." Id.
 
 
 99
 The third category recognized in Kasza is controlled by Totten. In defining this category of cases, we cited Reynolds's footnote 26, where, as discussed above, the Supreme Court expressly distinguished the Totten-type cases from other cases involving the state secrets privilege. Kasza, 133 F.3d at 1166. We also cited Totten's broader public policy holding. Id. We recognized that this category includes those cases where the subject matter of the suit is itself a state secret requiring dismissal. Id. In these cases, as soon as it becomes obvious to the court that the action is simply not justiciable, the case is dismissed. Dismissal can occur even before the court resolves evidentiary issues or discovery disputes implicating the plaintiff's ability to establish a prima facie case. Reynolds, 345 U.S. at 11 n. 26, 73 S.Ct. 528; Kasza, 133 F.3d at 1166 (citing Totten, 92 U.S. at 107); see also In re United States, 872 F.2d 472, 478 (D.C.Cir.1989) (noting with approval the district court's order distinguishing cases where the subject matter of the litigation is a state secret from those where the discovery requested is the state secret).
 
 
 100
 We concluded that the plaintiffs' discovery in Kasza was not only barred by the state secrets privilege, which prevented them from establishing their prima facie case justifying dismissal, but also that the plaintiffs' claims fell into the third category of cases represented by Totten because the Air Force could neither "confirm or disprove that any hazardous waste had been generated, stored, or disposed of at the operating location." Kasza, 133 F.3d at 1163, 1170.
 
 
 101
 The majority stretches the court's holding in Kasza beyond its logical bounds to find that "[i]t is therefore the law of this circuit that Totten permits dismissal of cases in which it is asserted that the very subject is a state secret only after complying with the formalities and court investigation requirements that have developed since Totten within the framework of the state secrets doctrine." Maj. Op. at 1150 (emphasis in original).
 
 
 102
 Kasza neither announced nor applied such a rule. While the Kasza court chose to rule on the Totten issue after it ruled on the state secrets privilege, nothing in Kasza suggests that judicial review of Totten-type claims is mandated. Instead, the Kasza court specifically identified the Totten-type of cases as a separate type of case where dismissal may be appropriate on the pleadings. Kasza makes clear that in the third category of cases "the court should dismiss the plaintiff's action based solely on the invocation of the state secrets privilege" without the judicial balancing required in the discovery-type cases. Kasza, 133 F.3d at 1166. Kasza's reliance on Reynolds's footnote 26 for support further compels the conclusion that no judicial determination need be made before applying the jurisdictional bar announced in Totten. Kasza, 133 F.3d at 1166.
 
 
 103
 After a careful review of Supreme Court case law, as well as our own holding in Kasza, I conclude the state secrets privilege announced in Reynolds does not limit or modify Totten or its bar on judicial review of cases where the subject matter of the lawsuit is a state secret. Rather, Totten continues to permit a court to determine that the subject matter of a suit is beyond judicial scrutiny and may properly be dismissed at the pleading stage. See Reynolds, 345 U.S. at 11 n. 26, 73 S.Ct. 528; Kasza, 133 F.3d at 1166. Other courts have come to the same conclusion. See Guong v. United States, 860 F.2d 1063, 1066 (Fed.Cir.1988) ("A close reading of Reynolds reveals that it does not limit or modify the authority of Totten or its rationale."). While the Supreme Court certainly could have supplanted Totten with Reynolds, it did not, and the majority should not do so in this case.
 
 II
 
 104
 The majority opinion also errs in limiting the application of Totten to contract claims. While such a limitation is necessary to reach the result the majority is determined to announce in this case, the holding in Totten belies such a confined application. Rather, the rule announced in Totten extends to claims for tort or constitutional violations arising from the secret contractual relationship.
 
 
 105
 The district court acknowledged that proof of the existence of a contract for secret services between the Does and the CIA was a fact under Totten that would have precluded the continuation of this litigation. In an attempt to narrow the application of the Totten bar, however, the district court declared that "[r]egardless of whether a secret contract does exist, there are substantial issues and claims remaining in this case that lie outside the reach of Totten." Doe v. Tenet, 99 F.Supp.2d 1284, 1289 (W.D.Wash.2000). The district court reasoned that
 
 
 106
 [the Does] may be able to base their entitlement to receipt of the CIA's monetary stipend on theories other than contract. For example, if plaintiffs are able to prove that they had an entitlement to benefits based on a promissory or equitable estoppel theory, or if there is a regulatory or statutory basis for their entitlement, then they may be able to show a constitutionally protected property interest, regardless of Totten.
 
 
 107
 Id. at 1291 (footnote omitted).
 
 
 108
 The district court's limitation of Totten to contracts for secret services finds no support in Totten or its progeny. See, e.g., Weinberger v. Catholic Action of Hawaii/Peace Ed. Project, 454 U.S. 139, 146-47, 102 S.Ct. 197, 70 L.Ed.2d 298 (1981) (applying Totten to a National Environmental Policy Act claim); Guong, 860 F.2d at 1065 (applying Totten to bar claim for failure to rescue); Fitzgerald v. Penthouse Int'l, Ltd., 776 F.2d 1236, 1241-42, 1244 (4th Cir.1985) (citing Totten in support of dismissal of libel action); Kielczynski v. CIA, 128 F.Supp.2d 151, 162-63 (E.D.N.Y. 2001) (rejecting argument that constitutional claims arising from contract for secret services fall outside of Totten doctrine), aff'd sub nom. Kielczynski v. Does 1-2, No. 01-6103, 2003 WL 187164 (2d Cir. Jan. 23, 2003) (unpublished disposition). Totten itself did not limit its holding to those cases involving contracts for secret services. Instead, the Court held that "public policy forbids the maintenance of any suit in a court of justice, the trial of which would inevitably lead to the disclosure of matters which the law itself regards as confidential." 92 U.S. at 107 (emphasis added). The Court did not limit its holding to those circumstances where a secret contract must be revealed. Rather, the Court held, much more generally, that the maintenance of a suit is forbidden where any matter which the law regards as confidential would have to be disclosed. Id.
 
 
 109
 The breadth of the Totten doctrine is demonstrated in its application in Weinberger v. Catholic Action of Hawaii/Peace Ed. Project, 454 U.S. at 146-47, 102 S.Ct. 197. In Weinberger, the Supreme Court reversed our holding that the Navy could be required to prepare and release a "hypothetical" environmental impact statement with regard to the operation of one of its Hawaiian magazines capable of storing nuclear weapons. Id. at 140, 147, 102 S.Ct. 197. The Supreme Court observed that because the locations of nuclear weapons storage facilities were classified for national security reasons, "the Navy [could] neither admit nor deny that it propose[d] to store nuclear weapons at [the Hawaiian facility]." Id. at 146, 102 S.Ct. 197.
 
 
 110
 In holding that the Navy was therefore not required to prepare a "hypothetical" environmental impact statement, since it would necessarily result in the disclosure of classified information, the Court concluded that the degree of the Navy's compliance with the relevant environmental statutes was a matter "beyond judicial scrutiny." Id. Citing Totten, the Court concluded that the maintenance of this suit was forbidden since the case involved a matter which the law itself regards as confidential. Weinberger, 454 U.S. at 146-47, 102 S.Ct. 197.
 
 
 111
 These cases illustrate that the Totten doctrine applies to the facts of this case regardless of whether the Does' claim is based on a secret contract with the CIA or on other theories of relief that necessarily involve the disclosure of that secret relationship. Clever pleading cannot evade a clear prohibition.
 
 
 112
 As with a claim sounding strictly in contract, a claim based on theories of estoppel would require the Does to actually demonstrate a relationship with the CIA. It would require that the Does prove, for instance, a binding representation made by the CIA to the Does on which they relied to their detriment. But the very existence of such a relationship or implied contract for secret services between the Does and the CIA is a secret that cannot be disclosed, since disclosure of this fact would inevitably "compromise or embarrass our government in its public duties, or endanger the person or injure the character of the agent." Totten, 92 U.S. at 106.
 
 
 113
 Any attempt to demonstrate a regulatory or statutory basis for an entitlement to benefits from the CIA must fail for the same reason. Even assuming that the Does could demonstrate that either the statutory language of Section 403h, the statute from which the term "PL-110" is derived, or the regulations regarding the support provided to former PL-110 resettlees, actually mandate the relief requested, they would still have to prove that they were indeed individuals classified as PL-110s.[4] That is, the Does would have to show that a relationship or an agreement existed between themselves and the CIA that would entitle them to seek relief under these specific statutes and regulations for the benefits they now claim.
 
 
 114
 The district court also found that the Does "have sufficiently stated a claim that the government violated their substantive due process rights by creating a special relationship with plaintiffs and then failing to provide for their basic needs and protect them from deprivations of liberty, or by affirmatively placing them in danger." Doe v. Tenet, 99 F.Supp.2d at 1293. The Does could, as a general matter, assert a violation of their due process rights if (1) the CIA created a special relationship with them and thereafter abused that special relationship, or (2) if the CIA affirmatively placed the Does in danger. See L.W. v. Grubbs, 974 F.2d 119, 121 (9th Cir.1992). To succeed on their substantive due process claim, the Does would have to establish either that a relationship with the CIA in fact existed or that the CIA affirmatively placed them in danger. This they cannot do, for "the employment and the service were to be equally concealed." Totten, 92 U.S. at 106.
 
 III
 
 115
 Totten bars judicial review of cases arising out of secret contracts for espionage services even where the plaintiff alleges national security is no longer at risk because there has been public acknowledgment of the contract. Unlike the majority, I have no difficulty rejecting the plaintiffs' invitation to second-guess the DCI's determination of what information remains harmful to national security or otherwise embarrassing to the federal government.[5]
 
 
 116
 The highest judicial deference is owed to the DCI's determination that disclosure of the relationship between the Does and the CIA would pose a threat to national security. See 50 U.S.C. § 403-3 (providing that as part of its responsibilities, the DCI shall "protect intelligence sources and methods from unauthorized disclosure"). As the Supreme Court has declared, "Congress intended to give the Director of Central Intelligence broad power to protect the secrecy and integrity of the intelligence process. The reasons are too obvious to call for enlarged discussion; without such protections the Agency would be virtually impotent." CIA v. Sims, 471 U.S. 159, 170, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985).
 
 
 117
 In Sims, the Supreme Court aptly observed that judges are ill-suited to evaluate these secrecy considerations:
 
 
 118
 We seriously doubt whether a potential intelligence source will rest assured knowing that judges, who have little or no background in the delicate business of intelligence gathering, will order his identity revealed only after examining the facts of the case to determine whether the Agency actually needed to promise confidentiality in order to obtain the information.... Moreover, a court's decision whether an intelligence source will be harmed if his identity is revealed will often require complex political, historical, and psychological judgments.
 
 
 119
 * * *
 
 
 120
 And it is the responsibility of the Director of Central Intelligence, not that of the judiciary, to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the Agency's intelligence-gathering process.
 
 
 121
 Id. at 176, 180, 105 S.Ct. 1881.
 
 
 122
 The Does nevertheless assure the court that litigation of this case would not involve disclosure of any matter that would pose a threat to the nation's security interests, particularly where the espionage activities at issue occurred so long ago.
 
 
 123
 We should reject the Does' invitation to circumvent Totten, a case that itself was not decided until ten years after the end of the Civil War and, presumably, until after the need for secrecy had subsided. Instead, we would be well advised to adopt the rule set forth by the Federal Circuit in Guong, holding that "it cannot be doubted that Totten stands for the proposition that no action can be brought to enforce an alleged contract with the government when, at the time of its creation, the contract was secret or covert." Guong, 860 F.2d at 1065 (emphasis added). The Does' argument must fail because, as the Federal Circuit recognized, "what may seem historical trivia to [the plaintiff] may be of great moment to the government, which has a much broader view of the world scene." Id. at 1066.
 
 
 124
 Nor do I find persuasive the plaintiffs' argument that the existence of ambiguous correspondence allegedly exchanged between the parties transform their secret arrangement into a public one. See id.; see also Mackowski v. United States, 228 Ct.Cl. 717, 719 (1981) (rejecting the same argument and finding that speculation is not equivalent to public disclosure). To protect this country's legitimate interest in maintaining its national security, the existence of the alleged relationship between the Does and the United States is itself a fact not to be disclosed, and without this fact the case may not proceed.[6]
 
 IV
 
 125
 Also unpersuasive is the majority's reliance on modern judicial proceedings designed to protect confidential information from disclosure during the course of litigation, such as in camera proceedings, to save the Does' claims from dismissal. The district court quoted Webster v. Doe, 486 U.S. 592, 604, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988), to support its assertion that district courts have "latitude to control any discovery process which may be instituted so as to balance [plaintiffs'] need for access to proof which would support a colorable constitutional claim against the extraordinary needs of the CIA for confidentiality and the protection of its methods, sources, and mission." Doe v. Tenet, 99 F.Supp.2d at 1290 (quoting Webster, 486 U.S. at 604, 108 S.Ct. 2047). The district court noted that the CIA could also "request leave to submit materials in this matter under seal or in camera, or may assert the state secrets privilege recognized in [Reynolds]." Id. The district court and the majority's reliance on Webster and Reynolds is misplaced.
 
 
 126
 In Webster a discharged CIA employee filed a claim against the CIA alleging that he was fired because of his homosexuality. 486 U.S. at 595-96, 108 S.Ct. 2047. In an opinion where the majority never cited Totten, the Supreme Court held that, although the Director's discretionary decision to discharge an employee for national security reasons was not subject to judicial review under the Administrative Procedure Act, id. at 601, 108 S.Ct. 2047, the discharged employee's constitutional claims were judicially reviewable. Id. at 603-04, 108 S.Ct. 2047. The Webster Court reasoned that in enacting the relevant statute, Congress did not mean to impose restrictions denying courts the authority to resolve constitutional claims arising from the DCI's termination decisions. Id. at 604, 108 S.Ct. 2047. The Webster Court recognized that "claims attacking the hiring and promotion policies of the [CIA] are routinely entertained in federal court...." Id. The Court also reasoned that the employee's claims stemmed from the existence of the employment relationship and the information sought involved the "same sort of rummaging" found in employment cases. Id. In those circumstances, the Court concluded, the district court had the latitude to balance the plaintiff's need for access to proof with the government's need for confidentiality. Id.
 
 
 127
 Unlike the case at hand, Webster did not involve disclosure of the type of secret agreement that would preclude litigation under Totten. There is a difference between the domestic employment of Agency workers and foreign spies. It is no secret that federal employees work for the CIA in a variety of sensitive positions. Terminating one for an alleged impermissible reason is the grist of many labor and employment lawsuits. To the contrary, the Does cannot even establish the existence of their secret employment without running afoul of Totten. The "sort of rummaging" permissible in Webster is intolerable in cases controlled by Totten. Weinberger, 454 U.S. at 147, 102 S.Ct. 197 (citing Totten, 92 U.S. at 107).
 
 
 128
 The district court's reliance on Reynolds as authority to conduct in camera proceedings after forcing the government to answer the Complaint, thereby revealing the secret fact of employment, is likewise misplaced. The Reynolds Court held that when this is the case we should not jeopardize national security by "insisting upon an examination of the evidence, even by the judge alone, in chambers." Reynolds, 345 U.S. at 10, 73 S.Ct. 528 (emphasis added). Reynolds recognized that in those situations described by Totten as "inevitably lead[ing] to the disclosure of matters which the law itself regards as confidential," Totten, 92 U.S. at 107, no amount of judicial oversight is sufficient to protect the national security interests at stake.
 
 V
 
 129
 Although I do not think it is necessary to the resolution of this case, I note that even if the Does' claims could somehow overcome the Totten bar (which they cannot), the Tucker Act, 28 U.S.C. § 1491(a)(1), requires the Does to bring this case in the Court of Federal Claims.
 
 
 130
 The Tucker Act grants exclusive jurisdiction to the Court of Federal Claims for suits against the United States whenever an action seeks money damages or arises from an express or implied contract. 28 U.S.C. § 1491(a)(1); Demontiney v. United States ex rel. Dept. of Interior, 255 F.3d 801, 810 (9th Cir.2001).[7] This jurisdictional limitation extends to constitutional claims against the United States that are dependent on rights provided under a government contract. Tucson Airport Auth. v. Gen. Dynamics Corp., 136 F.3d 641, 647 (9th Cir.1998) (holding when constitutional claims are premised on the notion that the United States has some contractual obligation to the plaintiff that it has failed to satisfy, the claims are contractually based and must be heard in the Court of Federal Claims); North Star Alaska v. United States, 14 F.3d 36, 37 (9th Cir.1994) (holding if a plaintiff's claim is concerned with rights created within the contractual relationship, it falls within the Tucker Act).
 
 
 131
 The majority seeks to avoid this second jurisdictional obstacle by cleverly dissecting the Does' claims and recasting some of them as independent of the underlying contract. For example, the majority finds that the Does may have a liberty or due process claim outside of the Tucker Act because they allege that the CIA placed them in danger by bringing them to this country, providing them with false identities, and then failing to take care of them when Mr. Doe lost his job. The Does' "intentional endangerment" claim, however, is nothing more than a claim that the United States failed to provide for the Does as required by the parties' alleged agreement.
 
 
 132
 In the absence of an agreement with the government, the Does would have neither a false history nor an expectation of governmental aid. If the government owed the Does any duty at all, the source of that duty must be the alleged contract. Tucson Airport Auth., 136 F.3d at 647 (finding claim contractually based where "[the] duty, if it exists, derives from the contract"); see also Up State Federal Credit Union v. Walker, 198 F.3d 372, 377 (2d Cir.1999) (finding that the parties' dispute was contractual in nature and subject to the Tucker Act because, had the parties not entered into the contract, the plaintiff would have no claim against the government); Kielczynski, 128 F.Supp.2d at 160 (rejecting a former covert employee's argument that the source of his rights was the due process clause and finding instead that his cause of action was ultimately based on his contract with the CIA).
 
 
 133
 Likewise, the Does' due process claim — declaring that the Does seek only to compel "a constitutionally adequate hearing in which to adjudicate their rights" — is based on the their alleged secret contract with the CIA. In Kielczynski, a factually indistinguishable case, a district court rejected the same due process argument the Does raise here. 128 F.Supp.2d at 160-61. There, the plaintiff, who had been a former spy for the CIA, argued that the CIA's failure to conduct an adequate hearing in order to determine whether he was entitled to additional benefits violated the due process clause. Id. at 160. In that case, the court had no problem holding that the Tucker Act precluded it from exercising jurisdiction over the plaintiff's claim because "the very existence of the alleged due process claim hinge[d] on the existence of [the] contract."[8] Id. at 161, aff'd sub nom. Kielczynski v. Does 1-2, 2003 WL 187164 (2d Cir. Jan. 23, 2003) (unpublished disposition).
 
 
 134
 The Does' claim that CIA regulations and procedures entitle them to continued support as persons brought into the United States pursuant to the PL-110 program is also contractually based. The Tucker Act's jurisdictional grant includes claims upon any implied contract with the United States. The Does' PL-110 status claim is nothing more than an assertion that abstract CIA procedures, combined with the Does' status as participants in the PL-110 program, create an implied contractual obligation to pay them additional monetary support.
 
 
 135
 Finally, the Does' estoppel claim is contractually based because it depends on their ability to prove that the CIA entered into an agreement upon which it intended, or the Does rightfully believed that it intended, the Does to rely. See Watkins v. United States Army, 875 F.2d 699, 710 (9th Cir.1989). The Does' estoppel claim ultimately rests on their allegation that they entered into an agreement with the CIA, the Does satisfactorily performed their end of the bargain, and the CIA thereafter failed to perform as promised. Under our case law, the Does' estoppel claim is contractually based and must be heard in the Court of Federal Claims. Tucson Airport Auth., 136 F.3d at 647-48; North Star Alaska, 14 F.3d at 37.
 
 
 136
 We lack the power to exercise subject matter jurisdiction when Congress has given it to another court. The Does should not be permitted to evade the valid jurisdictional limitations of the Tucker Act by labeling their action as something other than what it truly is: a breach of contract claim.
 
 VI
 
 137
 There has been no change in the law of spy contracts since Totten was decided in 1875. The secret existence of the espionage relationship and a claim for greater compensation was not justiciable then; it is not justiciable now. Once it is clear that the plaintiff's action is controlled by Totten, no further proceedings are required and we must dismiss the case. The law for this class of cases has remained constant for 128 years.
 
 
 138
 We cannot avoid our obligation to follow Totten by suggesting that somehow the law has evolved to a point where the unequivocal rule announced therein is no longer necessary. Totten has not been supplanted by procedural rules enacted by Congress in order to protect confidentiality during the discovery phase of litigation under congressionally created causes of action. Unless the Supreme Court revisits Totten or Congress provides a new statutory remedy to further compensate former spies, we are required to abide by the Court's holding that "public policy forbids the maintenance of any suit in a court of justice, the trial of which would inevitably lead to the disclosure of matters which the law itself regards as confidential...." 92 U.S. at 107; see, e.g., Landrigan v. Stewart, 272 F.3d 1221, 1229 (9th Cir.2001) ("[W]e must leave it to the [Supreme] Court to overrule its own cases, if and when it decides to do so."); Hart v. Massanari, 266 F.3d 1155, 1170 (9th Cir.2001) ("Binding authority must be followed unless and until overruled by a body competent to do so.").
 
 
 139
 Proof of the existence of a contract for secret services or of a secret espionage relationship with the CIA is "itself a fact not be disclosed." Totten, 92 U.S. at 107. Because "[t]he secrecy which such contracts impose precludes any action for their enforcement," id., the Does' lawsuit is not justiciable under Totten. Even if the Does' suit could be heard in federal court, the Tucker Act mandates that it be filed in the Court of Federal Claims. Because the court's opinion fails to adhere to the jurisdictional limitations announced by the Supreme Court and enacted by Congress, I respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 28 U.S.C. § 2674 ("The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances....")
 
 
 [2]
 The majority overlooks the fact that in this case, likeTotten, the very subject matter of the suit is the state secret, and therefore Reynolds is not controlling authority and no formal invocation of the evidentiary privilege is necessary.
 
 
 [3]
 The district court dismissed the second case as mootSee Kasza, 133 F.3d at 1163.
 
 
 [4]
 In any event, it is unlikely that the Does would be able to demonstrate that either Section 403h or the regulations regarding so-called PL-110s mandate such relief. Section 403h simply provides that in his discretion, the Director of Central Intelligence ("DCI") may admit aliens into the United States for permanent residence "without regard to their inadmissibility under the immigration or any other laws and regulations." 50 U.S.C. § 403h. Nothing in the language of the statute itself even alludes to the provision of support, financial or otherwise, by the CIA or any other governmental agency. Further, the regulations provided to us demonstrate that although the CIA may have granted some benefits and support to others alleged to have been PL-110s, none of those regulations mandate the provision of such support. In fact, the regulations clearly indicate that the amount and extent of support provided is wholly within the discretion of the DCI and may be terminated at any time. To illustrate, a redacted 1990 internal CIA Regulation noted that the Agency's support "normally terminates when [an alien] acquires citizenship in our Country, but may be terminated earlier."
 
 
 [5]
 I reject the majority's view that judicial review of secret contracts for espionage services may actually enhance national security. According to the majority, if suppliers of military and espionage-related goods and services come to expect that promises cannot be enforced, their willingness to offer their services may in the long run dissipate. Maj. Op. at 1152. But such a policy determination is not ours to make. Rather, that decision is entrusted to the Executive Branch. The better rule is to dismiss such cases at the outset of the litigation without forcing an acknowledgment by the government and before any of the forbidden details can inadvertently come to light
 
 
 [6]
 A broader reading ofTotten is consistent with the Supreme Court's recognition of the public policy interest in, and the critical need for, secrecy in the intelligence field. Reviewing the congressional hearing testimony of Allen Dulles, the CIA's third DCI, and of Air Force General Vandenberg in support of the National Security Act of 1947, the Court in Sims, 471 U.S. at 171-172, 172 n. 16 (1985), quoted none other than George Washington on the need for complete secrecy in this sensitive area of government operations:
 Secrecy is inherently a key to successful intelligence operations. In the course of issuing orders for an intelligence mission, George Washington wrote to his agent:
 "The necessity of procuring good intelligence, is apparent and need not be further urged. All that remains for me to add is, that you keep the whole matter as secret as possible. For upon secrecy, success depends in most Enterprises of the kind, and for want of it they are generally defeated...." 8 Writings of George Washington 478-479 (J. Fitzpatrick ed.1933) (letter from George Washington to Colonel Elias Dayton, July 26, 1777).
 
 
 [7]
 The Tucker Act grants jurisdiction to the Court of Federal Claims:
 to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.
 28 U.S.C. § 1491(a)(1).
 
 
 [8]
 TheKielczynski court specifically rejected the reasoning of the district court in this case. Id. at 161.